FILED

# U.S. District Court

# Middle District of Florida

2009 JAN -9 P 12: 40

## Steven McBride

vs

3:09-CV-22-J-34 HTS

## Jacksonville Warehouses;
## Southern Packaging; AFL-CIO;
## UFCW LOCAL UNION #1996

# Civil Rights Complaint

# Jury Demand

I, Steven McBride, the plaintiff in the above styled action, file a demand for a jury trial.

DATED: 1-7-09

X _Steven McBride_

Steven McBride
P.O. Box 14209
Houston, TX  77221
832-443-1024

# <u>STATEMENT OF CLAIMS</u>

Claim # 1          Racial Discrimination (Title #42 USC 1981; State Law)

Claim # 2          Negligent

Claim # 3          Fraud

Claim # 4          Harassment/Retaliation

Claim # 5          Violation of union contract

Claim # 6          Various state law claims

Claim # 7          Employment discrimination (Title# 7 Civil Rights Act of 1964

Claim # 8

Claim # 9

❖ See Attached sheets #1 of # _____ for the statement of facts/events

*PART # A*

# STATEMENT OF FACTS

1. On or about March 2006, the plaintiff was hired as a forklift operator by the General Manager, Stan.
2. After being hired, I became a member of the union (U.F.C.W. #1996, also known as A.F.L. – C.I.O.), and faithfully paid my union dues.
3. The plaintiff, Steven McBride, is a U.S. Citizen of African American decent.
4. All of the defendants and attached listed lead persons/managers are U.S. Citizens of Anglo Saxon decent.
5. After several attempts to resolve my complaint through the union and/or through the management of Southern Packaging, after my discharge, I file an employment discrimination case.
6. On or about June 14, 2007, I mailed a copy of my official complaint to the following agencies:

   A. Jax Human Rights Commission
   c/o Employment Discrimination
   117 West Duval St.
   Jacksonville, FL  32202

   B. U.S. E.E.O.C
   1801 L Street, NW
   Washington, DC  20507

   C. UFCW Local Union #1996

   c/o Steve Lomax

   3302 McGinnis Ferry Road

   Suwanee, GA  30024

   D. AFL – CIO
   815 16th Street, NW
   Washington, DC  20016

7. On or about June 21, 2007, I received two (2) telephone calls from Mrs. Upton of the Jacksonville Human Rights Commission advising me that my complaint was received on June 19, 2007, and would be forwarded to the Florida Commission on Human Relations.
8. A few weeks later, on or about July 9, 2007, I received a letter from the Florid Commission on Human Relations advising me that my case was received and was being forwarded to Miami District Office.

9.  I then spent the next seven (7) months telephoning, writing ,faxing, and emailing the E.E.O.C. (at the Miami District Office) in order to obtain a status report on my case.

10. After contacting several supervisors (Robert Metaxa and Mrs. Ina), I was informed that my case was assigned to Deborah Bauer and that Mrs. Bauer wrongfully administratively closed my case.

11. The E.E.O.C. supervisors re-opened my case around February 2008; thereafter advising me that my original complaint was lost and requested that I send her another copy.

12. On or about February 11, 2008, I sent another copy of my complaint to the E.E.O.C. at the Miami District Office.

13. On or about May 5, 2008, I received a letter advising me that Deborah Bauer was once again assigned to investigate my case.

14. On or about September 16, 2008, I received a letter from Deborah Bauer advising me that she was going to be dismissing my case.  Thereafter on October 14, 2008, a letter of dismissal and notice of right to sue was issue in my case.

# "Racial Discrimination/Employment Part – B

1.  On several occasions, during my employment, I have applied for several leader person positions and have seen those positions given to less experienced and/or less educated Anglo Saxon male employees.

2.  The majority of the leader person/clerk positions are held by (given to) relatives under the practice of nepotism.

3.  Under the guise of nepotism, the defendants are practicing an old form of racism by passing over the Plaintiff for a promotion.

4.  The defendants' practice of nepotism clearly violates Federal and State law as well as the union contract.  See:  Contract, article #3, page #2

5.  The Plaintiff heard about the opening of all of the following clerk/leader person positions by word of mouth; at no time was a job position posted to wit:

    A.  Receiving Clerk
    B.  Asst. Receiving Clerk
    C.  2nd Shift Shipping clerk
    D.  Truck loading Clerk (Load Coordinator)

6.  "No jobs may be filed in any other manner except through the above job posting procedure"  Exhibit # _____ Pages #30 thru #33

7.  On or about, __June 2006___ when the Plaintiff heard about the job opening of the Building #3 Receiving Clerk position, the Plaintiff personally informed Stan (The General Manager) and Alvin (The Union Shop Stewart) about an interest in said job.

8.  A few days later, without any official notification, the receiving clerk position was given to Brian Austin (the son-in-law of Doyle Williams – Warehouse Foreman).

9.  On or about November 2006, when the Plaintiff heard about the job opening of the Assistance Receiving Clerk position, the Plaintiff personally informed Stan (The General Manager) and Alvin (the Union Shop Stewart) about applying for said job.

9-A  The Plaintiff was told that three people were being considered:  Darryl Dempsey, John Williams and I.

10.  A few weeks later, without any official notification, the Assistance Receiving Clerk position was given to John Williams, the son of Doyle Williams (Warehouse Foreman).

11.  On or about March 2007, when the Plaintiff heard about the job opening of the Second Shift Shipping Clerk position, the Plaintiff personally informed Stan (The General Manager) and Alvin (The Union Shop Stewart) about applying for said job.

12. Stan (The General Manager) informed the Plaintiff that two (2) people were being considered:  Darryl Dempsey. and I

13. A few days later, without any official notification, the Second Shift Shipping Clerk position was given to Robert L. Reynolds, the cousin of the General Manager.

14. On or about May 2007, when the Plaintiff heard about the job opening of the Load Coordinator Clerk, the Plaintiff personally informed Stan (The General Manager) and Alvin (The Union Shop Stewart) about applying for said job.

15. Stan (The General Manager) informed the Plaintiff that two (2) people were being considered:  Darryl Dempsey and I.

16. A few days later, without any official notification, the Truck Loading Clerk Position was given to Al Karoliwick, the brother-in-law of the Assistant Director.

17. On or about May 10, 2007, the Plaintiff filed a written grievance with Stan (The General Manager) and with Alvin (The Union Shop Steward) outlining the defendants' acts of racism by passing the Plaintiff up for a promotion and promoting/hiring Anglo Saxons.

18. As of this date, June 14, 2007, neither of the defendants, the union or Jacksonville Warehouse has responded to the Plaintiff's written grievances.

19. At no time did the defendants follow the union contract and post all of the above job openings.

# PART #C

# <u>"NEPOTISM"</u>

# <u>LEADER PERSONS POSITIONS</u>

1. Foster H. Shepherd, Owner-President C.E.O.

2. (Son of the owner) John <u>Sheroff</u>??? Vice President

3. (Son-in-law of the owner) Donald Zell, Director

4. (Brother of the Director) Royald A. Zell, Assistant Director

5. (Second Brother of the Director) Harold Zell, Director in Charge

6. (Nephew of Vice President) Stan (Last name unknown), General Manager

7. (Brother of General Manager) Chris (Last name unknown), Bldg# 1 Supervisor

8. (Cousin of the owner) Doyle Williams, Warehouse Foreman

9. (Son of Warehouse Foreman) John Williams, Split Shift Clerk

10. (Son-in-law of Warehouse Foreman) Brian (Last name unknown), Receiving Clerk

11. (Second Son of Warehouse Foreman) Brian Williams, Assistant Receiving Clerk

12. (Cousin of the General Manager) Steve (Last name unknown), Shipping Clerk

13. (Wife of the Shipping Clerk) Ellen (Last name unknown), Recoup. Supervisor

14. (Brother-in-law of Assistant Director) Al Karoliwick, Truck Loading Clerk

15. Darryl (Last name unknown), Chief Mechanic

16. (Son of Chief Mechanic) Darryl, Jr., (Last name unknown), Assistant Mechanic

17. (Cousin of the General Manager) Robert (Last name unknown), Second Shift Shipping Clerk

# PART # D

## DAMAGES

| | |
|---|---|
| COMPENSATORY | $50,000.00 |
| PAIN AND SUFFERING | $25,000.00 |
| BACK PAY | $30,000.00 |
| FRONT PAY | $10,000.00 |
| HUMILIATION | $30,000.00 |
| PUNITIVE | $50,000.00 |

EXHIBIT #1

# COMPLAINT

RECEIVED

JUN 19 2007

✳ ALL ORIGINAL COLOR COPIES, ARE
  PRESENTED TO, BOTH, THE COURTS AND/OR
GOVERNMENT AGENCIES

                    STEVEN McBRIDE
                    713-614-3715

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 510-2007-04646 |

## Florida Commission On Human Relations
*State or local Agency, if any*    and EEOC

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Mr. Steven Mc Bride** | **(832) 443-1024** | ▆▆▆▆ |

| Street Address | City, State and ZIP Code |
|---|---|
| **3566 Nathaniel Brown, #1, Houston, TX 77021** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **JACKSONVILLE WARHOUSES** | **15 - 100** | **(904) 786-0811** |

| Street Address | City, State and ZIP Code |
|---|---|
| **Dba Southern Packaging, 5330 West Fifth Street, Jacksonville, FL 32254** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **01-01-2007** | **06-14-2007** |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am Black. I was hired on or about March1, 2006, into the position of Forklift Operator. During my tenure with Respondent, I applied but was not selected for the following positions: Receiving Clerk, Split Shift Clerk, Second Shift Shipping Clerk, and Truck Loading Clerk. The positions were not properly posted or filled, and all were filled by non-Blacks who were less qualified than I.

Respondent gave me no valid reason for it's actions.

I believe I have been discriminated against because of my race, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| x 2-22-08    x *[signature]* <br> Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Miami District Office**

*EXHIBIT #3*

One Biscayne Tower
2 South Biscayne Blvd., Suite 2700
Miami, FL 33131
National Contact Center: (800) 669-4000
National Contact Center TTY: (800) 669-6820
Miami Status Line: (866) 408-8075
Miami Direct Dial: (305) 808-1851
TTY (305) 808-1742
FAX (305) 808-1741

September 16, 2008

Steven McBride
3527 Lydia Street
Houston, TX  77021

RE:     McBride v Jacksonville Warehouses
        Charge No. 510 2007 04646

Dear Mr. McBride:

This serves to advise you that Respondent's statement of position and supporting documentation
has been received and reviewed by the Commission.   Below please find a summary of
Respondent's statement of position in the above referenced matter.

You alleged that you were discriminated against because of your race, Black, in violation of Title
VII of the Civil Rights Act of 1964, (Title VII), as amended, when you were not selected for the
positions of Receiving Clerk, Split Shift Clerk, Second Shift Shipping Clerk, and Truck Loading
Clerk.  You further allege that the positions were not properly posted or filled, and all were filled
by non-Blacks less qualified than yourself.

Respondent denied that you were discriminated against as alleged.  Respondent states that the
position of Receiving Clerk became open in June 2006, and that Brian Austin was promoted into
that position on June 26, 2006, more than one year prior to your first contacting the Commission
to file your charge of discrimination in July 2007.  Respondent goes on to state that the position
of Split Shift Clerk has ever existed at Southern Packaging.  Respondent states the position of
Second Shift Shipping Clerk became open in March 2007.  Respondent goes on to state it ran an
advertisement in the Florida Times Union and that Robert L. Reynolds was hired for the position.
Respondent submitted a copy of Mr. Reynolds payroll status charge indicating that Mr. Reynolds
was employed as a working supervisor on March 19, 2007.  Finally, Respondent states that the
position of Truck Loading Clerk is referred to by it as Load Coordinator.  Respondent states this
position became open in September 2006, and was filled by Douglas Chatham, who assumed the
position on September 21, 2006, and subsequently quit in May 2007.

According to our records, your first contact with the Commission was July 2007, and as such, the
two positions timely filed are that of Second Shift Shipping Clerk and Load Coordinator, which
were new hired, and no current employees, regardless of race, were selected for promotion to
those positions.
Respondent has submitted legitimate non-discriminatory reasons for it's actions.  You have ten
(10) days from the date of this letter to submit in writing to me information, which supports your

allegations and refutes the above stated information submitted by the Respondent that you were not promoted because of your race.  If you do not submit the requested information within the ten (10) days, a final dismissal notice will be mailed to you. Once you receive the final dismissal notice you will have 90 days to file a private suit in federal or state court.

Sincerely,

Deborah H. Bauer
Senior Federal Investigator
305-808-1756

EEOC Form 161 (2/08)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: **Steven Mc Bride**<br>**3527 Lydia Street**<br>**Houston, TX 77021** | From: **Miami District Office**<br>**2 South Biscayne Blvd**<br>**Suite 2700**<br>**Miami, FL 33131** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **510-2007-04646** | **Deborah Bauer,**<br>**Senior Investigator** | **(305) 808-1756** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosures(s)

**Manuel Zurita,**
**Acting Director**

10/14/08
*(Date Mailed)*

cc: **William H. Andrews, Esq.**
**COFFMAN COLEMAN et al**
**800 West Monroe Street**
**Jacksonville, FL 32202**



EXHIBIT # 5
BALLON CHARACTER IN THE
BREAKROOM BLDG. #3 AFTER
FIRING DARRYL - A BLACKMAN



EXHIBIT "O
BALLON CHARACTER) IN THE
SHIPPING OFFICE, AFTER
FIRING DARRYL - A BLACK MAN

EXHIBIT "7
BALLOU CHARACTER IN THE
BREAKROOM (SHIPPING) AFTER
FIRING DARRYL - A BLACK MAN

*EXHIBIT B*

AGREEMENT

BETWEEN

UNITED FOOD AND COMMERCIAL WORKERS,

LOCAL UNION NO. 1996

AND

SOUTHERN PACKAGING AND DISTRIBUTION, CENTER INC.

EFFECTIVE:    January 1, 2006

EXPIRES:    December 31, 2008

TABLE OF CONTENTS

ARTICLE

PAGE

P R E A M B L E ...................................................... v

ARTICLE IRECOGNITION .............................................. 1

ARTICLE IIBARGAINING UNIT ......................................... 1

ARTICLE IIINON-DISCRIMINATION ..................................... 2

ARTICLE IVMANAGEMENT RIGHTS ....................................... 2

ARTICLE VNO STRIKES AND LOCKOUTS .................................. 5

ARTICLE VISAFETY AND HEALTH ....................................... 7

ARTICLE VIIDISCIPLINE AND DISCHARGE ............................... 8

ARTICLE VIIIPROBATIONARY EMPLOYEES ................................ 9

ARTICLE IXUNION STEWARDS ......................................... 11

ARTICLE XBULLETIN BOARDS ......................................... 11

ARTICLE XITHE WORK-WEEK .......................................... 12

ARTICLE XIIGRIEVANCE AND ARBITRATION PROCEDURE ................... 12

ARTICLE XIIISENIORITY AND LAY—OFF ................................ 16

ARTICLE XIVLOSS OR DAMAGE ........................................ 20

ARTICLE XVPERSONAL LEAVES OF ABSENCE ............................. 20

ARTICLE XVIUNION LEAVE OF ABSENCE ................................ 21

ARTICLE XVIIMEDICAL LEAVE ........................................ 22

FAMILY AND MEDICAL LEAVE ......................................... 23

ARTICLE XVIIIMILITARY LEAVE ...................................... 25

ARTICLE XIXJURY DUTY PAY ......................................... 26

ARTICLE XXFUNERAL LEAVE WITH PAY ................................. 26

ARTICLE XXIPAID TIME DUE TO JOB INJURY ....................... 27

ARTICLE XXIILUNCH PERIODS .................................... 28

ARTICLE XXIIIREST PERIODS .................................... 29

ARTICLE XXIVNO MERIT INCREASES ............................... 30

ARTICLE XXVNO TOLERANCE TIME ................................. 30

ARTICLE XXVINO SPLIT SHIFTS .................................. 31

ARTICLE XXVIIJOB POSTING AND TRANSFER RIGHTS ................. 31

ARTICLE XXVIIIOVERTIME AND WORK-WEEK ......................... 33

ARTICLE XXIXRATES OF PAY ..................................... 35

ARTICLE XXXWAGES AND CLASSIFICATIONS ........................ 36

ARTICLE XXXIHOLIDAYS ......................................... 36

ARTICLE XXXIIVACATIONS ....................................... 40

ARTICLE XXXIIICHECK—OFF OF UNION DUES ........................ 42

ARTICLE XXXIVREPRESENTATIVE CHECKING RIGHTS .................. 43

ARTICLE XXXVEFFECT OF INVALIDITY ............................. 43

ARTICLE XXXVIHEALTH AND WELFARE PLAN ......................... 44

ARTICLE XXXVIIENTIRE AGREEMENT ............................... 46

ARTICLE XXXVIIIDURATION OF AGREEMENT ......................... 47

## P R E A M B L E

This Agreement was reached after negotiations in good faith and entered into this 1st day of January, 2006, between Southern Packaging & Distribution Center, Inc. (hereinafter referred to as the "Company") and United Food and Commercial Workers International Union Local No. 1996, AFL—CIO—CLC, (hereinafter referred to as the "Union").

It is the general purpose of this Agreement to promote the mutual interest of the Company and the Union by providing for the uninterrupted operation of the Company's warehouses, and to do so when conditions which will further, to the extent practicable, the safety, health, and working conditions of the employees, and the security and efficiency of the business.

## ARTICLE I

### RECOGNITION

The Company recognizes the Union, The United Food and commercial Workers International Union Local No. 1996, AFL-CIO—CLC, which granted recognition on the 28th of January, 1987, following verification to a mutual third party that the majority of the Company's employees employed at Southern Packaging and Distribution Center, Inc., having expressed by signed authorization, their desire to be represented by said Union. Further, the Company recognizes the aforementioned Union as the collective bargaining representative of the Company's employees of C.I.T.A.C. having previously expressed their desire to be represented by said Union.

## ARTICLE II

### BARGAINING UNIT

The bargaining unit consists of and this Agreement applies to all warehouse employees, drivers, including forklift operators, shipping and receiving clerks, re-coupers and Janitors employed at the Company's facilities in Jacksonville Florida, but excluding all security, auditors, mechanics, office clerical employees, guards and supervisors as defined by the Act.

1

## ARTICLE III

### NON-DISCRIMINATION

The parties agree that there will be no discrimination against any employee in the application of the terms of this Agreement by reason of race, color, creed, sex, age or national origin. The parties further affirm their mutual commitment to observe and implement any applicable governmental regulations relating to equal employment Opportunity.

## ARTICLE IV

### MANAGEMENT RIGHTS

Section 1. RESERVATION OF RIGHTS:  It is recognized that all management functions, whether heretofore or hereafter exercised and regardless of the frequency of infrequency of their exercise, including but not limited to an exclusive control, direction and supervision of operations and personnel (including the right to hire, promote, demote and transfer employees are vested solely in the Company. The exercise of any such functions by the Company shall not be contrary to the express provisions of this Agreement.

Section 2. GENERAL UNDERSTANDING:  Without limiting the provisions of Section 1, but in order to clarify some of the more important rights retained by management, the Company shall have the following rights to:

2

(a)   determine the qualifications for and to hire new employees;

(b)   determine the number of employees it shall employ, establish new jobs, abolish or change existing jobs, and increase or decrease the number of jobs, employees and working hours;

(c)   determine what services it shall perform and the acceptable level of performance for employees;

(d)   maintain order and efficiency of its operations;

(e)   determine the type or types of vehicles, machinery and equipment to be used and operated;

(f)   hire, lay off, recall, assign, transfer, promote, demote, suspend, discipline, or discharge employees for just cause;

(g)   determine the method or methods by which it shall do business and the terms upon which its services shall be sold, leased or given away;

(h)   change the processes by which work is carried out and done, the method of operation and the schedules of operation;

(i)   determine its financial policy;

(j)   make reasonable rules and regulations governing the operation of its business and the conduct of

3

its employees, which rules shall be followed by employees. Further, the Company may revise such rules from time to time as it may deem necessary;

(k) subcontract any of its operations; however, the Company agrees to notify the Union beforehand and discuss, upon request, the effects (not the decision to subcontract) in those cases where such subcontracting will result in the permanent displacement of unit employees or loss of work for unit employees on layoff;

(l) sell, transfer, assign or otherwise dispose of its operations, however, the Company agrees to discuss, upon request, the effects (not the decision) of such actions; and

(m) establish as many shifts as necessary, beginning at such times and for such length of time as the Company shall, in its discretion, deem adequate to meet its requirements.

Section 3. The Company reserves and retains in full and completely any and all management rights, prerogatives and Privileges, unless specifically limited by this Agreement, provided that those rights shall not be used for the purpose of discriminating against an employee or the Union.

4

Section 4. Notwithstanding any other provisions of this Agreement, the Company may assign to any employee work which is not normally performed by the Employee wherever it is reasonable to do so and either practical for the purpose of efficient operations or necessary to eliminate standby time or in cases of emergency.

## ARTICLE V

## NO STRIKES AND LOCKOUTS

Section 1. The Company agrees that so long as this Agreement is in effect, there shall be no lockouts. The curtailment of any operations for business reasons shall not be considered to be a lockout. The Union, its officers, agents, members and the bargaining unit employees covered by this Agreement all agree that so long as this Agreement is in effect, there shall be no strikes (including sympathy strikes) sit downs, slow downs, picketing, employee demonstrations, stoppages of work, boycotts or any other acts that Interfere with the Company's operations or the performance of its business, and such persons further agree that they will take all affirmative action legally available to prevent or stop anything that occurs in disregard to this commitment. Any violation of the foregoing provision may be made the subject of disciplinary action, up to and including discharge.

Section 2. In the event of discharge or discipline of an employee for violation of this Article, a grievance with respect

thereto may be processed for the purpose of determining whether a violation, in fact, occurred. If such grievance is arbitrated, the Arbitrator shall have no authority to change the penalty imposed by the Company unless the Arbitrator finds the employee or employees have not violated any of the foregoing provisions of this Article. If the Arbitrator finds the employee or employees have not violated any of the foregoing provisions, the remedy may not exceed reinstatement with back pay, less interim earnings.

## ARTICLE VI

### SAFETY AND HEALTH

Section 1. The Company and the Union agree that they will conform to and comply with applicable laws as to safety and health.

Section 2. The Company and the Union will cooperate in the continuous objective of eliminating hazards to safety and/or health arising from unsafe working conditions.

Section 3. The Union will comply with any safety standards, rules or procedures, developed by the Company, and the Union will take all affirmative steps to assure employee compliance with such standards and procedures.

Section 4. A Safety Committee shall be established for the duration of the Agreement and be composed of at least one representative from management and not more than two bargaining unit employees, one from each shift. The Committee shall meet every sixty (60) days, and one (1) scheduled meeting per year should include all employees, to review safety procedures and practices and may make recommendations to management. A copy of written recommendations and management's response thereto shall be provided to the Union.

Section 5. The Company and the Union recogniz drug free work place and have agreed to the poli made part of the Agreement as Appendix B.

7

## ARTICLE VII

### DISCIPLINE AND DISCHARGE

<u>Section 1</u>. The Company shall have the right at any time adopt and put into effect reasonable work rules and regulations not in conflict with this Agreement.

Violation of any of the standard rules shall be grounds for disciplinary action, up to and including discharge.

<u>Section 2</u>. The Union shall receive a copy of such work rules and advance written notice of any changes of work rules and regulations. Thereafter, the Company shall post on its bulletin board and shall keep posted for at least two (2) weeks a written or printed copy of all such changes or new rules and regulations.

<u>Section 3</u>. The Union will be notified in writing by mail of all discharges and/or disciplinary action by the Company resulting in the loss of pay to any employee. Such notice shall state the specific reason for the action taken. Said notice shall be sent to the Union office within 48 hours after the discharge. Saturday, Sundays and holidays will be excluded as part of the <u>48</u> hour notice.

<u>Section 4</u>. Any claim by an employee who has completed his probationary period, that he has been unjustly discharged or has unjustly lost pay as the result of disciplinary action, shall be subject only to this grievance provided the grievance is presented

8

to the Company in writing within ten (10) days following the postmark of written Company notice resulting in loss of pay. Saturdays, Sundays and holidays will be excluded from the 10 day period.

Section 5. Upon a mutually agreeable date, the parties shall meet to review the discharge or discipline. Should the parties fail to reach an agreement, the Company shall give the Union its position in writing. Thereafter, the Union shall have thirty (30) days, excluding Saturdays, Sundays and holidays, to advise the Company in writing of its desire to proceed to arbitration, otherwise the matter will be considered closed.

### ARTICLE VIII

### PROBATIONARY EMPLOYEES

Section 1. Employees shall serve a probationary period of sixty (60) calendar days, during which time they shall be considered probationary employees, except that illnesses or approved leaves shall not be counted toward completion of the probationary period. A probationary employee's service with the Company may be terminated at any time by the Company in its sole discretion and neither the employee nor the Union shall have recourse of the Grievance and Arbitration Procedure over such termination.

9

Section 2. It is understood that probationary employees who are discharged, laid off, or quit before completing their Probationary period are not subject to recall as provided for in the Seniority article. In the event probationary employees are re-hired, seniority shall be measured from the date of the most recent return to work. In the event of such re-hire, time previously worked for the Company within the past six (6) months shall be counted toward completion of the probationary period. In all other cases, seniority shall be measured from the original date of hire, provided the employee has successfully completed the probationary period.

## ARTICLE IX

### UNION STEWARDS

Section 1. The Company recognizes the right of the Union to designate one regular steward per shift, per location, provided such location has at least six (6) full-time employees.

Section 2. It is understood that the Stewards of the Union, at all times, should be regular full—time employees, and the Union shall furnish the Company with a complete list of Stewards, which shall be revised from time-to—time as may be necessary.

## ARTICLE X

### BULLETIN BOARDS

Section 1. A bulletin board area in the Dispatch Office shall be made available for the Union's use in posting notices Pertaining to Union matters. The Company will receive copies of all such notices from the Union upon posting and the Company reserves the right to inspect and discuss all materials.

Section 2. All Union materials placed on the bulletin board area shall be approved by a Union officer. The Union bulletin board shall not be used for disseminating propaganda of any kind whatsoever, and shall not be used for posting or distributing pamphlets of political matter of any kind or advertising.

## ARTICLE XI

### THE WORK-WEEK

11

Section 1. A work—week shall consist of seven (7) consecutive and successive days, starting on the same calendar day of each week. A single work—week shall be established for the whole bargaining unit, and may be changed from time-to-time by the Company with notice to the Union.

Section 2. Nothing in this Agreement shall be construed as a guarantee or limitation on the hours of work. The hours of work for each employee shall be scheduled by the Company.

Section 3. Employees reporting to work as scheduled shall be given at least four (4) hours work or pay.

## ARTICLE XII

### GRIEVANCE AND ARBITRATION PROCEDURE

Section 1. The Company and the Union shall make a sincere effort to settle promptly any differences, disputes or complaints arising over the interpretation or application of the contents of this Agreement.

Section 2. A grievance is defined and limited as a dispute an employee who has completed their probationary period may have as to the interpretation, application, or alleged violation of an express provision(s) of this Agreement, not including discharge and discipline matters as provided for in Article VII.

Section 3. All grievances after Step 1 must be reduced to writing and must contain the following information:

12

(A)   Article and Section of the Agreement alleged to have been violated;

(B)   A full statement of the grievance, giving all relevant facts, witnesses, dates, and times of events, and specific adjustment requested;

(C)   Signature of grievance and date signed; and

(D)   Signature of the Union Steward or designee.

Section 4. PROCESSING OF GRIEVANCE

STEP 1:    At a mutually agreeable time, all grievances shall be first discussed verbally between the immediate supervisor, the grievant and the Steward. If the grievance is not resolved in three (3) working days, the grievance, in order to be processed, must be submitted as outlined in Step 2.

STEP 2:    After Step 1, within three (3) working days the grievance must be submitted in writing to the immediate supervisor. A copy will be retained for the Steward and one copy sent to the Union by the Steward. If the grievance is not resolved within ten (10) working days, it will be processed to Step 3.

STEP 3:    After Step 2, if the grievance is not resolved to the satisfaction of the Union, it may request a conference within ten (10) working days between the grievant, Steward, District Union Representative, and the Company's designated Representative. Within ten (10) working days after the

conference, the Company's Representative shall provide its position in writing.

STEP 4:   The Union shall have ten (10) working days from receipt of the Company's written position to request in writing to the Company that the matter be settled through Arbitration. Failing to do so within the ten (10) working days, the grievance shall then be considered at an end.

STEP 5:   Thereafter, within ten (10) working days, either party or both jointly may request the Federal Mediation & Conciliation Service to provide a panel of seven (7) persons from which an arbitrator shall be selected by alternatively striking names from the panel with the party requesting arbitration striking the first name.

Section 5. For purposes of the grievance procedure in this Article "working days" shall be defined as Monday through Friday, excluding Holidays as set forth in Article XXXI.

Section 6. LIMITATIONS ON THE POWERS OF THE ARBITRATOR:

(a)   The Arbitrator shall have no power to establish wage scales, or, except if he is specifically empowered, to change any wage;

(b)   The Arbitrator shall only have power to rule on matters arising under and during the term of this Agreement;

(c)   The Arbitrator shall have no power to arbitrate any matter after this Agreement has expired, unless the

14

grievance occurs before the expiration of this Agreement and is timely processed; and

(d)     The Arbitrator shall not have the right to modify, amend or add to this Agreement and his decision shall be final and binding on both parties.

Section 7. The expenses incurred in the Arbitration proceedings, such as hearing room and Arbitrator's fees, shall be paid by the losing party.

Section 8. TIME LIMITS MANDATORY. The time limits of the grievance and arbitration procedure are mandatory and may not be waived except by mutual written agreement. In the event the Company fails to answer a grievance within the time limits set forth in Step 1 and/or 2. the grievance shall be considered denied and moved to the next Step of the grievance procedure. In the event the grievant or the Union fails to appeal a grievance on a timely basis as provided herein, the grievance shall be considered at an end.

Section 9. All settlements of grievances after Step 1 shall be in writing and signed off by both the Company and the Union Representative in that Step.

Section 10. At any step in this grievance procedure, the Executive Officer or his designated representative shall have the final authority in respect to a complaint, difficulty or dispute, if the dispute lacks merit or jurisdiction under the terms of this Agreement.

## ARTICLE XIII

### SENIORITY AND LAY—OFF

Section 1. "Seniority" shall mean length of service from last employment date. In the event the Company employs a group of applicants at the same time, seniority shall be by alphabetical sequence of last names; if last name is identical, seniority shall be the first name. In the event of a lay-off, probationary employees throughout shall be the first laid off.

Section 2. Seniority shall be followed in the event of decreases of forces and re-hiring after lay-off. When a decrease or realignment of the bargaining unit occurs, those employees who are senior and qualified to perform available jobs will be required to fill such jobs.

Section 3. In all cases of lay—off, the following three (3) factors shall be considered: (a) seniority; (b) qualified to perform the work with training not to exceed fifteen (15) days; and (c) physical fitness.

If the factors listed in (b) and (c) above are relatively equal in the opinion of the Company as between two or more employees, then seniority will be the determining factor.

Any senior employee so displaced shall have preference in filling any job vacancy, provided in the opinion of the Company, he or she is qualified to perform the available work. Any employee

16

"bumping" into a different job classification shall be paid only at the rate into which he or she "bumps". Any employee adversely affected under this Section may use the grievance procedure of Article XII for final determination.

Section 4. Based on production demands, the Company may transfer qualified employees from one department to another, provided, however, such transfer shall not result into a lay-off of employees who normally work in such area.

Section 5. The decision concerning what order employees will be recalled will be made by the Company but the senior employee for the job will be recalled first and given fifteen (15) days training, if necessary, whether on lay-off or working elsewhere for the Company, after which the Company will decide if the employee is qualified. If not the next senior employee will be recalled.

Section 6. LOSS OF SENIORITY:  Seniority of an employee will be considered broken and all rights forfeited and there shall be no obligation to re—hire when the employee:

(a)   voluntarily leaves the service of the Company;

(b)   is discharged for just cause, and not reinstated;

(c)   has been out of employment by the Company for a period equal to the seniority of the time of the lay-off up to a maximum of eighteen (18) months;

(d)   fails to return to work when recalled or cannot be located after reasonable effort. Such time shall not

exceed three (3) working days. However, the Company shall also notify the employee by certified mail, at last known address, that the employee is to return to work, and a copy of the notice is to be sent to the Union headquarters;

(e)   fails to return to work when an approved leave of absence by the Company expires, and in such cases where leave is granted, it shall be in writing setting forth the date the employee must return to work and a copy of such written leave shall be sent to the Union headquarters;

(f)   accepts employment with another employer while on approved leave of absence or during an unexcused absence from the Company;

(g)   is absent from work for more than three (3) work days without advising his immediate supervisor in advance, when possible;

(h)   fails to report to work on his first scheduled shift on the first day following his vacation or the expiration of any authorized leave of absence, unless he is unable to because of illness or accident; the Company may require the employee to furnish proof to its satisfaction of the cause for reporting late;

(i)   gives a false reason for a leave of absence or time; and

18

    (j)   fails to secure written permission from the Company for a

           leave of absence.

## ARTICLE XIV

### LOSS OR DAMAGE

Section 1. The Company and Union jointly recognize that damage, loss, and/or theft of equipment, materials, merchandise and supplies, in whatever manner, poses a threat to the well-being of the Company and the employees. As a result, employees and the Union will use their best efforts to assist the Company in maintaining maximum security and high sanitation standards in the warehouse.

Section 2. Employees will use their best efforts to protect and further the interests of the Company by conserving and protecting its property and by furnishing the highest quality of service at minimum costs. Likewise the Union pledges to cooperate with the Company in promoting the advancement and welfare of the business.

## ARTICLE XV

### PERSONAL LEAVES OF ABSENCE

Section 1. An employee desiring a leave of absence exceeding three (3) working days from the job shall secure written permission from the Company. Failure to comply with this provision shall result in the complete loss of seniority. An approved leave of absence shall not exceed ninety (90) consecutive (or accumulated)

20

calendar days in any one (1) year of employment, except that an extension of a leave of absence may be granted at Company discretion.

Section 2. REPORTING ABSENCE: In all cases and for any reason where an employee is unable to report for work at regular starting time, he or she shall so inform the foreman or supervisor as soon as possible before his regular starting time, except in a case of emergency wherein the supervisor shall be notified by the employee before the beginning of work.

Section 3. A copy of the authorized leaves shall be mailed to the Union headquarters, it shall state the date on which the employee is returned to work completing the leave of absence.

Section 4. Approved leaves of absence shall not affect the seniority of an employee.

**ARTICLE XVI**

**UNION LEAVE OF ABSENCE**

The Company agrees to permit not more than two (2) employees leave of absence without pay, not to exceed two (2) weeks, in order to attend a Union conference or convention to which said employee may be elected or appointed. Not more than one (1) employee from a shift will be permitted such leave at the same time.

**ARTICLE XVII**

21

## MEDICAL LEAVE

Section 1. A full-time employee shall be granted a medical leave of absence to begin at a time that a doctor(s) determines that the employee is disabled and should no longer work. The leave will expire at such time as the employee's doctor determines the employee may safely return to work.

Section 2. In returning to work, the employee shall be returned to the department and job from which the employee left, provided that the employee's seniority would have retained the employee on that job while on medical leave.

Section 3. If an employee on medical leave of absence seeks employment elsewhere and is employed, the employee shall lose all seniority rights.

Section 4. When returning from leave, the employee shall notify the Company with a written doctor's statement as to the date that the employee's doctor will release the employee to return to work. If the employee does not return to work at the time the leave expires, the employee shall be considered to have voluntarily resigned as of the last day worked. The employee must return to work no later than three (3) regular work days following the doctor's medical release to return to work.

Section 5. Pregnancy leave shall be considered as any other illness or disability as to the application of this Article.

Section 6. An employee who has obtained a medical leave through fraud or misrepresentation shall be subject to discharge.

## FAMILY AND MEDICAL LEAVE

(1)  Eligible employees will be granted up to twelve (12) weeks of unpaid leave for their own serious illness, to care for a newborn or newly adopted child, or the care of a seriously ill child, spouse, or parent.

(2)  Employees must be employed for at least one (1) year. One year of services does not have to be continuous. Prior service is included in determining eligibility.

(3)  Employees must exhaust all paid vacation or other paid leave before taking family leave. This paid time will be counted toward the twelve (12) weeks available for family leave.

(4)  Employees shall immediately return to work upon termination of family leave. Failure to do so shall constitute termination of employment.

(5)  An employee who has been granted family leave shall be considered as having quit without notice if while on family leave the employee engages in or applies for other employment.

(6) An employee who has obtained a family leave through fraud or misrepresentation shall be subject to discharge at the sole discretion of management.

(7) In the case of leave for birth or adoption of a child an employee must provide thirty (30) days advance notice before the date on which the leave would begin.

(8) Employees will be required to provide certification, acceptable to the Company, of a serious health condition for their own condition or that of a family member. The employee must provide such certification to the Company prior to the beginning of the leave or in case of emergency within one (1) week of the beginning of the leave. The certification must include the date on which the serious health condition in question begins; the probable duration of the condition; appropriate facts regarding the condition; a statement that the employee is needed to care for a spouse, parent, or child (along with an estimate of the time required), or that the employee is unable to perform his or her job duties.

(9) The Company may require subsequent re-certification on a reasonable basis.

(10) After the leave period is completed the employee will return to either the same job or a job equivalent in pay.

24

(11) Employees who are not capable of performing the essential function of their regular job at the end of FMLA leave lose reinstatement and restoration of rights.

## ARTICLE XVIII

### MILITARY LEAVE

An employee who enters military service and returns to work will be given job reinstatement rights in accordance with applicable Federal Laws as set forth by the U.S. Department of Labor.

25

## ARTICLE XIX

### JURY DUTY PAY

Section 1. When an employee is absent from work to perform jury service, the Company will pay him his regular rate of pay for each hour he is absent from work when called to serve or serves on jury duty, less jury fees received by him for performing such services, provided that the employee provides written proof of call to service of jury duty or service of jury duty, days served, jury duty payment to the Company, and further, if the employee is excused from jury duty he is required to report to work for the balance of his work shift.

Section 2. Night shift employees required to serve as jurors will be excused from work for the night prior to reporting for jury duty under the same pay provisions in Section 1 above.

## ARTICLE XX

### FUNERAL LEAVE WITH PAY

Section 1. In the case of the death of a parent, child, spouse, brother or sister, stepchild or adopted child of a regular full-time employee requiring the absence of said employee from his regularly scheduled assignment for the purpose of preparing for and/or attending the funeral, then such employee shall be granted a leave of absence of up to three (3) consecutive calendar days. Employees granted leave as set forth in Section 1 will be paid

26

three (3) days pay provided such leave day be taken during normal work days and fall between the date of death and two days following the funeral.

Section 2. Employee shall on request be granted time off without pay sufficient to travel and attend the funeral of a mother—in—law, father—in—law, grandmother, grandfather, grandchild, stepmother or stepfather.

## ARTICLE XXI

### PAID TIME DUE TO JOB INJURY

Section 1. Employees will be paid traveling time plus time lost when receiving medical attention resulting from an on—the—job accident. If the doctor determines that the employee is unable to return to work, the employee will be guaranteed up to eight (8) hours pay for the day, including travel time and medical attention time.

Section 2. Time spent going to and from the doctor's office and medical treatment on the date of the accident shall be on Company time, up to eight (8) hours a day.

Section 3. Only hours involved shall be counted and if the day is less than eight (8) hours, the employee shall receive gang (department) time under Sections 1 and 2.

Section 4. Employees who are injured at work shall immediately report such injury to their foreman. Should the injury necessitate

medical treatment in a doctors office or hospital, the Company agrees to furnish transportation for the employee.

Section 5. An employee who is required by the Company to take a periodic medical examination shall be given such examination during working hours and such time as is necessary for the examination shall be paid for by the Company at the employee's basic hourly rate.

Section 6. An employee required to be examined by the Company physician to determine fitness for returning to work following an absence of five (5) or more working days as a result of an injury or illness shall be paid at his basic straight-time hourly rate for the time necessary for the examination.

## ARTICLE XXII

### LUNCH PERIODS

Section 1. Employees shall receive meal periods in accordance with the following schedule, set by the Company for each shift:

Each employee shall be allowed a meal period on his own time of one—half (½) hour.

Section 2. In such cases where employees are specifically instructed to work over seven (7) consecutive hours without a meal period, they shall be paid time and one-half for all hours worked over seven (7) consecutive hours until a meal period is granted,

28

however, an additional fifteen (15) minutes may be worked if needed to complete a day's work.

Section 3. Employees working overtime into another shift shall take their second meal period consistent with the regular shift meal period.


## ARTICLE XXIII

### REST PERIODS

Section 1. The Company agrees to grant all employees a fifteen (15) minute rest period during the first five (5) hours of work. The rest period shall not start prior to an employee's having completed at least one (1) hour of his shift, nor shall there be any rest periods one (1) hour prior to lunch.

Section 2. After returning from lunch, the employee shall be entitled to a fifteen (15) minute rest period within three (3) hours of work.

Section 3. If an employee works more than ten (10) hours then he will be entitled to an additional paid fifteen (15) minute break after the tenth hour of work.

Section 4. If an employee works fourteen (14) or more hours then he will be entitled to an additional paid fifteen (15) minute break.


## ARTICLE XXIV

## NO MERIT INCREASES

No individual wage increase or merit increase shall be granted by the Company to any employee without prior approval of the Union.

## ARTICLE XXV

## NO TOLERANCE TIME

The Company agrees to compensate employees for all time worked. In the event an employee has to wait before being able to start work at his scheduled starting time, or should the employee work beyond his scheduled working time, the employee shall be compensated for such waiting and working time. It is understood that employees will be at their work station in accordance with their pre-arranged scheduled time.

## ARTICLE XXVI

## NO SPLIT SHIFTS

No employee shall be required to work a scheduled split shift under any circumstances.

## ARTICLE XXVII

## JOB POSTING AND TRANSFER RIGHTS

Section 1.

(a)   When a permanent vacancy occurs in any job group, the job shall be posted by management on the bulletin board for a

30

period of three (3) working days in order to give employees an opportunity to bid for the job. The job shall be filled by selecting from among those who bid for a job, the employee with the greatest amount of seniority. Any employee desiring to be selected for the original job vacancy must sign the posting. Subsequent vacancies will be posted following original selection in the same manner.

(b) When there are permanent vacancies in leader person position employees may use their Company seniority to claim these permanent vacancies so long as they are qualified to perform the unfilled job. Qualifications, ability and aptitude will be determined by the Company.

Section 2. No jobs may be filled in any other manner except through the above job posting procedures, (except if there are no bidders, Company can use new hires, contractors, etc.) and a copy of the job postings showing the names of employees who bid the job, if applicable, and a copy of the selection notice shall be forwarded to the Union office for their records.

Section 3. Job vacancies of less than fifteen (15) days duration may be filled by the management by upgrading an employee with the greatest amount of seniority. In such cases, the employee upgraded shall receive the higher rate of pay for the job, but when down-graded, shall not have their rate reduced. All job vacancies

31

of more than fifteen (15) days resulting because of sickness, pregnancy, accident, camp duty, jury duty, etc., shall be filled by posting temporary jobs in the same manner as permanent jobs are filled. Employees shall be given an opportunity to qualify for such temporary jobs and when the employee returns who held the job on a permanent basis, then the temporary job also shall be concluded and the employee who filled the job shall return to his job previously held. Copies of all temporary postings and selections shall be sent to the Union office.

Section 4. Employees who fail to qualify following their selection through the bidding procedure shall be returned to the job from which they moved, without loss of seniority. Employees shall have a reasonable period of time on a new job to qualify to satisfactorily perform the job. The qualifying period will vary with the complexity and nature of the job, but will in no case exceed thirty (30) calendar days unless extended by mutual agreement between the Company and the Union.

Section 5. In cases where employees have failed to qualify for the job and desire additional training, such training period, if granted, will be jointly established by the parties.

Section 6. An employee who voluntarily requests a transfer to a lower rated Job vacancy due to verified medical reasons by a doctor's statement shall begin with the lower rate from the date he is placed on the job; however, employees who make such requests to

32

be transferred shall be placed after the posting and selection procedures.

## ARTICLE XXVIII

### OVERTIME AND WORK-WEEK

Section 1. The normal work-week for straight time pay purposes commences on Monday, 12:01 a.m., eight (8) hours per day, five (5) days per work-week.  In the event that overtime is required, the Company will try and give at least two hours notice.  The Company will continue its past practice of allowing employees to leave the facility for child care accommodation reasons.  In the event that any employee abuses this past practice, they will be subject to discipline up to and including discharge.

Section 2. SUNDAY PREMIUM:  Work performed during the twenty-four (24) hour Sunday will be paid at double-time the rate.

Employees whose work schedules normally require that they work on Sunday will not receive double the rate for Sunday as such but shall receive double the rate for any work performed during their twenty-four (24) hour designated Sunday.

Section 3. DAILY OVERTIME: Daily overtime will be paid at the rate of time and one-half (1-1/2) after eight hours of work.

Section 4. DOUBLE TIME ON DAILY BASIS: All work beyond twelve (12) hours in any one day shall be paid for at double the employee's

hourly rate of pay. However, in no case shall an employee be required to work more than sixteen (16) hours in any work day.

Section 5. SATURDAY PREMIUM: Work performed on Saturday during the twenty-four (24) hour period will be paid at time and one-half (1-1/2) the straight time rate, provided forty (40) or more hours are worked, Monday through Friday. Additional premium pay may be applicable under this Article for Saturday work.

Section 6. EQUALIZATION OF OVERTIME:

(a)   Every reasonable effort will be made to equalize overtime by warehouse location on a quarterly basis.

(b)   An overtime log will be kept by warehouse location. The log will record the name of the employees asked or called and the number of hours involved.

(c)   Overtime will be assigned by seniority order as needed and rotated as hours become available daily.

**ARTICLE XXIX**

**RATES OF PAY**

Section 1. An employee may be temporarily assigned by the Company to a higher rated job for a period of not more than four (4) hours. However, should the employee work on the job for more than four (4) hours, he shall be paid the higher rate for the entire day. If the job to which he is transferred carries a lesser rate, his rate will not be reduced.

34

Section 2.   It is agreed, during the term of this Agreement between the parties, that in the event the Company adds new equipment requiring the setting up of job classifications, rates shall be established by the Company subject to negotiation with the Union before or during the first thirty (30) days of such new or revised job operations. The base job classification shall be added to Appendix "A" and such new jobs shall be filled in accordance with this Agreement. Any rate for a new job classification shall not exceed 85% of the current leaderman rate.

## ARTICLE XXX

## WAGES AND CLASSIFICATIONS

The wages and classifications covering thee employees in the bargaining unit have been agreed to and by this reference are made part of this Agreement in Appendix "A". All new hires will track the lowest starting pay for the applicable job category as specified in Appendix "A", less one dollar and twenty—five cents ($1.25) per hour during their probationary period. Such new hired employees will also receive the general wage increases as negotiated.

## ARTICLE XXXI

## HOLIDAYS

Section 1.  GUARANTEED HOLIDAYS:  The Company agrees to recognize and guarantee the following days as legal holidays:

35

1.   New Year's Day        6.   Memorial Day

2.   Fourth of July        7.   (A) Christmas Eve (½ day)

3.   Labor Day             7.   (B) New Year's Eve (½ Day)

4.   Thanksgiving Day      8.   Two Personal Holidays

5.   Christmas Day

Employees shall receive eight (8) hours at their straight time hourly rate when no work is performed, however, these paid holidays shall not apply to probationary employees during the first ten (10) calendar days of their employment, provided the employee:

(a)   Works his last scheduled work day prior to the immediate holiday and his first scheduled work day following the immediate holiday;

(b)   Failure to comply with the above provision because of

(I)     Death in immediate family as set forth in Article XX;

(II)    Wife giving birth to a child or any medical procedure in connection with a pregnancy;

(III)   Participation in a meeting with the Company as a representative or part of a committee of the Union;

(IV)    Accident or illness substantiated by medical evidence (if requested by the Company) that employee was unable to work;

(V)    Excused absence by the Company;

shall not deprive the employee from receiving holiday pay.

(c)    If the employee is scheduled to work on a day to be observed by the Company as a holiday and fails to work as scheduled for reasons other than listed in Part (B) above, the absence from work shall be unexcused and the employee shall forfeit holiday pay.

Section 2. SUNDAY HOLIDAYS OBSERVED ON FRIDAY OR MONDAY: When any recognized holiday as provided for herein falls on Sunday, the previous Friday or following Monday shall be recognized as the holiday, whichever the Company designates.

Section 3. PREMIUM PAY FOR HOLIDAY WORK: Any employee who works on any of the holidays listed above shall be paid time and one-half (1-1/2) times his rates of pay for all hours worked on the holiday and in addition he shall receive the straight time provided for in Section 1 above. After eight (8) hours of work on a holiday, an employee will be paid two and one-half (2—1/2) times the straight time rate, except for probationary employees during their first ten (10) days of employment.

Section 4. HOLIDAY PAY WHEN ON VACATION: Employees on paid vacation during a week in which one of the recognized holidays occur will be granted an additional scheduled work day as vacation

37

for which he will receive his holiday pay allowance for eight (8) hours at his straight time hourly rate for that day.

Section 5. If one (1) or more holidays as listed in Section 1 occurs during a period when an employee is of f as a result of their requesting a leave of absence which was granted, then the employee shall not be eligible for holiday pay allowance during that period.

Section 6. If any of the holidays fall on Saturday, under normal working conditions the holiday will be observed on Saturday; however, in any year in which Christmas Day falls on Saturday, the preceding Friday shall be recognized as the holiday.

Section 7. Hours not worked on a holiday shall not be counted as hours worked during the week on which the holiday occurs for overtime purposes over forty (40) hours. Hours worked on a recognized paid holiday shall count in computing overtime hours worked over forty (40) hours in such work week.

Section 8. Holidays in this Agreement declared by Congress to be observed on Monday shall be observed on such day rather than on the named day.

Section 9. Employees laid off during a calendar week in which a holiday occurs shall be entitled to holiday pay allowance.

## ARTICLE XXXII

### VACATIONS

Section 1. All employees who have been in the employ of the Company for a period of one (1) unbroken anniversary year and less than two (2) years shall earn one (2.) weeks vacation with pay.

Section 2. All employees who have been in the employ of the Company for at least two (2) years but less than five (5) years shall earn two (2) weeks vacation with pay.

Section 3. All employees who have been in the employ of the Company for five (5) years or more shall earn three (3) weeks vacation with pay.

Section 4. An employee shall be informed before going on vacation of the day and time he shall return to work.

Section 5. Vacations shall not be scheduled during the final two (2) weeks of quarter-end periods. A vacation selection chart shall be posted on the bulletin board in all departments in order for employees to select a vacation date. Selection shall be based on seniority; that is, employees with the greatest seniority shall have preferences for any vacation dates. In cases of conflict the senior employee shall have preference. Vacations shall be granted subject to the needs of the business.

Section 6. Following the initial vacation, employees shall be permitted to take their vacation any time after establishing active employment in a calendar year subject to other restrictions as noted, and will not be permitted to carry vacation time from one year to the next.

Section 7. Employees who quit or are discharged or otherwise separated from the payroll and have vacations fully earned but not taken by them shall receive their vacation pay. In case of death, such earned vacation pay shall be paid to the employee's estate or the person legally entitled.

Section 8. Except in extreme hardship, and with the mutual approval of the Company and the Union, no employees shall receive pay in lieu of vacation.

Section 9. Employees shall be paid their vacation pay at the beginning of their vacation period.

Section 10.

(A)   Employees who have more than one (1) week paid vacation shall be permitted to split their vacation in increments of not less than one (1) day.

(B)   The application of seniority shall apply only in the selection of the first part of a split vacation. The second part of the split vacation shall be made only after all other employees have had an opportunity to select their first preference.


**ARTICLE XXXIII**

**CHECK—OFF OF UNION DUES**

The Company shall deduct from the wages of their employees for the duration of the present contract or any renewal thereafter

40

union dues, on a weekly basis and remit same to Local Union 1996 once each month in such amount as Local Union 1996 shall determine and provide for its members generally from the pay of each employee who has signed a properly approved authorization card. The Union shall officially, in writing, notify the employer of its current initiation fee and dues, and if there is any change, notice of the change will be given to the Employer in writing.

The Employer will make deductions weekly from employees who have signed an Active Ballot Club check-off card and the money collected will be forwarded to the President of United Food and Commercial Workers Local Union No. 1996 at the end of each month.

## ARTICLE XXXIV

### REPRESENTATIVE CHECKING RIGHTS

Any duly authorized Union representative of U.F.C.W. Local Union 1996 shall have the right to visit the warehouse and may be accompanied by the Company Vice President or his representative at a time mutually agreed to for the purpose of observing the operations that have been added or changed and to check on compliance of this Agreement upon request.

## ARTICLE XXXV

### EFFECT OF INVALIDITY

41

Section 1. The parties hereto agree that should an Article, part of paragraph of his Agreement be declared by a federal or state court of competent and final jurisdiction in the premises to be unlawful, invalid, ineffective or unenforceable, said Article, part of paragraph, shall not affect the validity and enforceability of any other Article or part of Paragraph hereof, and the remainder of this Agreement shall continue in full force and effect.

Section 2. The parties also agree, at the request of either party, to re-negotiate on any Article, part of paragraph of this Agreement that has been declared unlawful, invalid, ineffective, or unenforceable as specified above.

### ARTICLE XXXVI

### HEALTH AND WELFARE PLAN

The Employer has executed a collective bargaining agreement with United Food and Commercial Workers Local Union 1996 which provides for contributions to United Food and Commercial Unions and Employers Health and Welfare Fund, according to the formula specified in the Collective Bargaining Agreement.

Section 1. Effective with the January 2006 payment, the Company will contribute the amount of $288.00 per month for each plan participant, beginning January 2007, the Company will contribute the amount of $317.00 per month for each plan participant and beginning January 2008, the Company will contribute the amount of $348.50 per month for each plan participate.

42

Section 2.  For all newly hired employees, the Company agrees to make initial contributions the first of the month after the employee has completed ninety (90) days of employment.  Employees shall become eligible for benefits in accordance with the Rules of Eligibility as adopted by the Trustees, or as may be amended from time to time by the Trustees.

The Employer agrees to pay the contributions to the Trust Fund for eligible employees for one (1) month following termination of employment.

Section 3. Continuation of coverage - the Employer will be limited to pay six (6) months premiums in the event of illness, compensable illness or accident or layoff, for each such covered absence.  Employees will, at the completion of each covered period, be advised of any other option they may have for self coverage. The employer agrees to pay contributions to the Trust Fund for eligible employees on an approved Family and Medical Leave of absence, not to exceed twelve (12) weeks pursuant to the provisions of the Family and Medical Leave Act.  Employee contributions which have been discontinued as provided in Section 2 will be resumed on the first day of the month following a return to work on the Employer's active payroll after illness or injury.

## ARTICLE XXXVII

## ENTIRE AGREEMENT

The parties acknowledge that during the negotiations which resulted in this Agreement, each had unlimited right and opportunity to make demands and proposals with respect to any subject matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Company and the Union, for the duration of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject matter not specifically referred to, or covered in this Agreement, even though such subjects or matters may not have been with the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement. This Article shall not be construed in any way to restrict the parties from commencing negotiations in order to negotiate an agreement to take effect upon the termination of this Agreement.

## ARTICLE XXXVIII

### DURATION OF AGREEMENT

This Agreement shall commence on January 1, 2006, and shall continue in full force and effect until Midnight, December 31, 2008.  If either each party desires to renegotiate this Agreement, it may do so by giving the other party written notice to that effect, not less than sixty (60) days prior to December 31, 2008.

IN WITNESS HEREOF, the parties have caused this Agreement to be signed by their duly authorized representatives.

SOUTHERN PACKAGING AND
DISTRIBUTION CENTER, INC.

UNITED FOOD AND COMMERCIAL
WORKERS, LOCAL UNION 1996
AFL-CIO-CLC

_____
12-27-05
DATE

_____
1/9/06
DATE

45

ADDENDUM A

Rates of Pay.

a. Beginning on the payroll period immediately following the ratification of this contract by the bargaining unit, all bargaining unit employees will receive a 35 cents per hour across the board increase.   In the second and third year of the contract, employees will receive a 15 cents across the board increase.

Ratification Bonus

b. Upon ratification of the contract, employees who are employed between 2 and 4 years will receive a $100.00 ratification bonus, employees who are employed from 5 to 9 years will receive a $200.00 ratification bonus, and employees employed 10 or more years will receive a $300.00 ratification bonus.